IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|   |   |
|---|---|
| | : |
| LEDO PIZZA SYSTEM, INC., et al. | |
| | : |
| v. | :   Civil Action No. DKC 06-3177 |
| | : |
| LEDO RESTAURANT, INC., et al. | |
| | : |

**MEMORANDUM OPINION**

The background of this breach of contract, trademark infringement, and unfair competition dispute is set forth in an earlier memorandum opinion resolving cross-motions for summary judgment.  (Paper 94).  Plaintiffs Ledo Pizza System, Inc. ("Ledo System"), Ledo Pizza Carryouts, Ltd. ("Ledo Carryouts"), Robert M. Beall, Margaret K. Beall, Robert G. Beall, Troy L. Beall, James B. Beall, Garth E. Beall, Robert W. Beall, Thelma W. Beall, Mildred Beall, and Thelma B. Beall filed this lawsuit against Defendants Ledo Restaurant, Inc. ("the Ledo Restaurant"), Huntington City Restaurant, Inc., d/b/a T.J. Elliott's Restaurant ("T.J. Elliott's Restaurant"), Huntington City Enterprises, LLC, d/b/a Expressions Catering ("Expressions Catering"), Thomas E. Marcos, Jr. ("Tommy Marcos"), Thomas E. Marcos, Sr., and James L. Marcos ("Jimmy Marcos"), alleging

breach of contract, trademark violations, and unfair competition.[1]

## I.    Background

The parties' dispute arises from their agreement over the use of the trademark/servicemark "LEDO PIZZA®." The parties co-owned Ledo System and Ledo Carryouts prior to entering into a Settlement Agreement and a Licensing Agreement (together, "the Agreements") in July 1994 to resolve prior litigation between them. (Plaintiffs' Ex. 1, Settlement Agreement; Ex. 2, Licensing Agreement). Under the Agreements, Defendants Tommy Marcos, his brother Jimmy Marcos (together, "the Marcos brothers"), and Thomas E. Marcos, Sr. (collectively, "the Marcoses"), sold their shares in the businesses to Plaintiffs. Plaintiffs obtained sole ownership of the mark, but the Agreements allowed for certain uses by the Marcoses. Specifically, the Marcoses retained the right to own and operate the Ledo Restaurant in Adelphi, Maryland, and to establish future restaurants or carryouts in Bowie, Maryland.[2] The

---

[1] Summary judgment was previously granted in favor of Defendant Thomas E. Marcos, Sr.

[2] Soon after the Settlement Agreement was executed, and consistent with its terms, the Marcoses established T.J. Elliott's Restaurant in Bowie.

Agreements also granted the Marcoses the rights to "use the names 'Ledo Restaurant,' 'Original Ledo Restaurant' or any other derivative name thereof except 'Original Ledo Pizza,' . . . in connection with the operation [of those establishments]." (Ex. 2 at ¶ 1(b)(3)).

## II. Trial

Plaintiffs' Second Amended Complaint originally contained seven counts, some of which were resolved on summary judgment. The remaining claims relate to alleged breaches of contract by Tommy Marcos, Jimmy Marcos, and Ledo Restaurant, Inc., and trademark and unfair competition claims against Expressions Catering, a limited liability company of which the Marcos brothers were members.[3]  These claims were tried to the court, without a jury.  As will be discussed, there were relatively minor breaches of contract by the Marcos brothers, resulting in

---

[3] Aside from the claims that were resolved on summary judgment and those considered at trial, Plaintiffs' Second Amended Complaint additionally raises one breach of contract claim related to the rights asserted by Defendants, through counsel, in a November 10, 2006, letter to Plaintiffs' counsel. (Plaintiffs' Ex. 12).  Like Mrs. O'Leary's cow, this letter, regarding which party was entitled to enjoy the publicity generated by a favorable review from Oprah Winfrey, sparked the litigious fire that has raged ever since.  In and of itself, however, the letter stating Defendants' position on the issue clearly was not a breach of the parties' Agreements.  Indeed, Plaintiffs have presented no argument or evidence suggesting otherwise.

nominal damages.  Plaintiffs have proven that some of the advertising by Expressions Catering violated their trademark rights, but have failed to prove that the actual sale of pizzas constituted trademark violations.  Based upon the evidence presented at the bench trial, the following constitute findings of fact and conclusions of law.

### A.   Findings of Fact

Ledo Restaurant, Inc., is the Ledo Restaurant, the original restaurant in Adelphi that was established in the 1950s by Thomas E. Marcos, Sr., and Robert L. Beall, the patriarchs of the parties in this case.[4]   Tommy Marcos runs its day-to-day operations.   Huntington City Restaurant, Inc., t/a T.J. Elliott's, owns and operates T.J. Elliott's Restaurant in Bowie. Jimmy Marcos runs the day-to-day operations there.   At all times relevant, both the Ledo Restaurant and T.J. Elliott's Restaurant were permitted to use Ledo intellectual property and serve Ledo pizza subject to the limitations imposed by the Agreements.

Huntington City Enterprises, LLC, t/a Expressions Catering, is a Maryland limited liability company that owns and operates a catering business called Expressions Catering.   Expressions was

---

[4] Tommy and Jimmy Marcos apparently retain an ownership in the Adelphi restaurant, although the record is not entirely clear.

created in early 2003 by the Marcos brothers, who are each 30%
owners, and Deborah Hamann, also a 30% owner, along with another
investor.   The business initially operated from the kitchen at
T.J. Elliott's Restaurant in Bowie, but subsequently moved to
Owings, Maryland, in Calvert County.   The Marcos brothers may be
directors or officers of Expressions, but they definitely are
not employees, and neither is regularly involved in its
operations.   Ms. Hamann runs the day-to-day operations of
Expressions Catering and is responsible for all advertising and
promotional activities.

The Marcos brothers recall that Ms. Hamann was told of the
history of the Ledo relationships, but no written directions
were given to her about the use of the Ledo marks.   During a
conversation with both Marcos brothers at the beginning of the
catering business, Ms. Hamann was told that Expressions Catering
could not sell Ledo pizza.   There were initial discussions about
the wording of a brochure concerning any mention of the
"original" Ledo Restaurant, but there were no further
discussions.

One incident in particular began the chain of events that
gave rise to many of Plaintiffs' claims.   A female customer
called Tommy Marcos at Ledo Restaurant to inquire as to whether
the restaurant could provide catering services for a wedding in

February 2005.  He told her that the restaurant did not cater,
but referred her to Debbie Hamann and Expressions Catering.  The
caller also said that she wanted pizzas from the Ledo Restaurant
for the wedding party, which raised no red flag in Mr. Marcos'
mind with respect to a potential violation of the Agreements.
As he testified:

> She presented it to me as two different
> issues; that she was looking for a caterer
> and did we cater, and I told her no, I
> didn't, but I could refer her to someone,
> and then she told me she wanted to get
> pizzas for her wedding party, or something
> along those lines, and, again, I sell
> pizzas, so I didn't see where there was an
> issue.

(Tr. at 188).  Expressions Catering was hired to cater the
wedding, and on or about the day of the event, Debbie Hamann
received eight pizzas from the Ledo Restaurant.  Tommy Marcos
gave Ms. Hamann an open invoice, assuming she would give it to
the customer who ordered the pizza and collect the money for the
restaurant.  No record of the invoice remains, however, and
Expressions Catering never paid the Ledo Restaurant for the
pizzas.

Ms. Hamann recalls learning from Tommy Marcos that one of
his customers whose daughter was getting married needed a
caterer and wanted to serve Ledo pizza at the wedding.
According to Ms. Hamann, Tommy Marcos said he would provide the

pizzas and asked her to prepare the other food.  She does not recall whether she picked up the pizzas at the restaurant or if Tommy brought them to her, but she included "Ledo Pizza" on the menu and invoice.  She also rented a pizza oven to heat the pizzas at the event, which was held at Seneca Lodge in Montgomery County.  Instead of paying the Ledo Restaurant for the pizza, Ms. Hamann "bartered" with Mr. Marcos by preparing desserts for the restaurant.

Thereafter, Expressions Catering began including "Ledo Pizza" on some of its menus and eventually handled two other events at which Ledo pizza was served.  One, a bar mitzvah, included six pizzas purchased from the Ledo Pizza location in Edgewater, Maryland, one of Plaintiffs' franchisees or licensees.  On the second occasion, two Ledo pizzas were offered for sale by-the-slice at an event sponsored by the Fire Department in Huntingtown, Maryland.  Those pizzas were purchased at the Ledo Pizza location in Prince Frederick, Maryland, also one of Plaintiffs' franchisees or licensees.  No pizza was sold at the Huntingtown event, however.

Another event involved Expressions Catering and the serving of "Ledo" lasagna and tiramisu.  Cornerstone, a church in Bowie, conducted a two-day theater presentation at which food was served. Jimmy Marcos prepared all of the food, including the

lasagna and tiramisu, which was picked up from T.J. Elliott's Restaurant by Cornerstone on one day and by Ms. Hamann on the other. Expressions' role was to coordinate the event and, in order to build the business, it was treated as an Expressions Catering event. Although Ms. Hamann referred in her testimony to the lasagna and tiramisu as "Ledo," no evidence was presented that it was labeled as such at the event; however, Ms. Hamann subsequently included "Ledo Lasagna" and "Ledo Tiramisu" on Expressions' menus. At around the time the suit was filed, the Marcos brothers learned that Expressions Catering had sold Ledo pizza and Ms. Hamann was instructed to stop the practice, which she did.

Ms. Regina Newell set up websites for the Ledo Restaurant, T.J. Elliott's Restaurant, and Expressions Catering. Initially, she was advised orally of the restrictions on the use of Ledo Pizza marks when she worked on the Expressions Catering website. When she had previously set up the Ledo Restaurant and T.J. Elliott's websites, she was told by Jimmy Marcos that she could post anything "positive" about the restaurants. Although the Marcos brothers arranged for creation of the websites and inspected them during the initial phase, they did not regularly monitor their contents thereafter.

Critical to any understanding of the forces driving this dispute is the November 2006 airing of a segment on The Oprah Winfrey Show, which, depending on which party is consulted, named either Ledo Pizza or the pizza served at the Ledo Restaurant as among the best in the United States. While this would appear to be a boon to business for both parties, they unfortunately did not see eye-to-eye on the import of the segment, and because of residual distrust from an earlier dispute, each side came to believe that the other was unfairly trying to capitalize on the publicity.

Adding fuel to the fire was a November 6, 2006, article in *Washingtonian* magazine, which opined that the pizza offered "through the mediocre Ledo Pizza chain" did not "do justice" to the "real thing" available at the Ledo Restaurant. Without consulting either of the Marcos brothers, Ms. Newell posted the article and a related link to a Washingtonian.com "Restaurant Chat" on both the Ledo Restaurant and T.J. Elliott's websites. The Marcos brothers were not aware that these items had been posted until around the time this law suit was filed, at which point Jimmy Marcos instructed Ms. Newell to remove them. Ms. Newell removed the article and the link from the Ledo Restaurant site, but forgot that they were also posted on the T.J.

Elliott's site until a couple of weeks later, at which point they were removed from that site as well.[5]

## B.   Conclusions of Law

### 1.   Count One

The remaining portions of count one for breach of contract relate to alleged disparaging comments by the Marcos brothers and the use by Expressions Catering of Ledo marks and sale of Ledo pizza.

Section 5.3 of the Settlement Agreement prohibits either party from making "any oral or written disparaging statements regarding any business, business practice, operation, product or service" with respect to the other party.[6]   The term "disparage"

---

[5] Plaintiffs Robert M. Beall, President of Ledo Carryouts, and James B. Beall, President of Ledo System, testified as to allegedly disparaging comments in a letter to the editor published in *The Capital*, an Annapolis newspaper. (Plaintiffs' Ex. 17).   The letter was written by Heather Nalley, the granddaughter of Thomas Marcos, Sr.   The content of this article cannot be attributed to the Marcos brothers, however, as they had no knowledge that it existed prior to the time this suit was filed.   Because there is no evidence suggesting that it was posted on any of the websites at issue, it is inconsequential insofar as this case is concerned.

[6] The Licensing Agreement, in section 1(d), states that the Marcoses "will not . . . disparage Carryouts' ownership" of the Ledo marks.   This provision concerns disparagement as to the "ownership" of the Ledo marks, rather than the product of the franchisees or licensees; thus, it is not implicated in this action.

is not defined by the parties.   In construing this term in
similar cases, other courts have resorted to dictionary
definitions:

> "The term, 'disparagement,' is defined in
> Webster's Third New Intl. Dictionary (1961)
> as 'diminution of esteem or standing and
> dignity; disgrace . . ., the expression of a
> low opinion of something; detraction.'"
> *City Group v. Ehlers*, 198 Ga.App. 709,
> 710(1), 402 S.E.2d 787 (1991).   See also
> Webster's      New       Universal     Unabridged
> Dictionary   (2nd   ed.   1983)   (defining
> disparagement as "anything that detracts or
> discredits").

*Eichelkraut v. Camp*, 236 Ga.App. 721, 723, 513 S.E.2d 267, 269
(Ga.Ct.App. 1999).   Similarly, another court found:

> The   meaning   of   "disparage"   must   be
> determined   by   reference   to   ordinary
> principles of contract interpretation.   In
> the absence of any argument by the parties
> on this point, we see no reason why
> "disparage" should not be given its
> ordinary, non-technical meaning: "to speak
> of in a belittling way; to reduce in rank or
> esteem." Webster's New Riverside University
> Dictionary 387 (1984).

*Patlovich v. Rudd*, 949 F.Supp. 585, 595 (N.D.Ill. 1996).

Under these definitions, the tenor of the *Washingtonian*
article was clearly disparaging, as it belittled the pizza
offered by Plaintiffs and extolled the virtue of the pizza
offered by Defendants.   While the opinion was not directly
expressed by Defendants, it appeared on two websites for which

11

they were responsible.   Ms. Newell was their agent and they cannot avoid responsibility by claiming to be unaware of the fact that she posted it for them.   Thus, Plaintiffs have established a breach of contract by the Marcos brothers and Ledo Restaurant, Inc., on the disparagement aspect of that claim.

They have also established a breach for the use of Ledo marks and sale of Ledo products by Expressions Catering.   Under the Agreements, the Marcos brothers were entitled to operate the Ledo Restaurant in Adelphi and T.J. Elliott's Restaurant in Bowie.   At both locations, they were permitted to provide seated dining and carryout services, but could not provide delivery service, or sell pizzas outside their designated territories. They enlisted the assistance of Expressions Catering to provide eight pizzas to the wedding party in Montgomery County.   While this technically was a breach of the Settlement Agreement, it was totally inadvertent.   The customer initiated the transaction and Tommy Marcos unwittingly adopted the mechanism, through Expressions, to provide the customer what she wanted. Unfortunately, this event prompted Ms. Hamann to compound the problem by adding "Ledo Pizza" to some of Expressions' sample menus.   This resulted in one further sale of Ledo pizza by Expressions, at the bar mitzvah, although those pizzas were not

purchased from the Ledo Restaurant, but from one of Plaintiffs'
franchisees or licensees.

The initial incident, in which eight pizzas were provided
by Expressions Catering to the ultimate customer, was a breach
of contract by Tommy Marcos and the Ledo Restaurant.  Plaintiffs
contend that the Marcos brothers are also responsible for the
other sales of Ledo pizza by Expressions Catering under a
principal/agent theory, but this argument is unpersuasive.[7]
While the Marcos brothers together own a majority of Expressions
Catering, they are not and never have been involved in the day-
to-day operations of that business.    Tommy Marcos made
Expressions his agent only for the wedding event and not
generally.   The later actions of Ms. Hamann in serving Ledo
pizza was not a breach of contract by the Marcos brothers or
Ledo Restaurant, Inc.  The inclusion of "Ledo Pizza" and "Ledo"
tiramisu and lasagna on the Expressions Catering website

---

[7] Plaintiffs point to section 5.2 of the Settlement
Agreement, which precludes "the Marcoses, Ledo Restaurant, or
any of their successors or assigns" from using the Ledo
intellectual property "directly or indirectly," except as
expressly permitted.   Unlike the covenants concerning the Bowie
area spelled out in section 5.1, however, section 5.2 does not
apply to "any corporation, partnership, joint venture, company
or other association in which [the Marcoses] . . . have an
interest (other than a 5% or less stock position in a publicly
traded company)."  (Plaintiff's Ex. 1, section 5.1).   Thus,
Expressions Catering is not subject to section 5.2.

involves a slightly different analysis, but ultimately reaches the same result insofar as Plaintiffs' agency argument is concerned.   The Marcos brothers hired the same webmaster for their other restaurant websites, but that does not make them responsible for the menu listings on the Expressions Catering website.

Defendants argue that any breach was not material. Materiality, however, is not a prerequisite to recover damages for breach of contract; rather, it comes into play only when the non-breaching party seeks to be excused from its own performance:

> A party is not automatically excused from the future performance of contract obligations every time the other party commits a breach; if a breach is relatively minor and not of the essence, the plaintiff is still bound by the contract and may not abandon performance and obtain damages for a total breach by the defendant, though the nonbreaching party is entitled to damages caused even by the immaterial breach, albeit that these may be nominal in amount. Otherwise stated, a nonperforming party is liable for any breach of contract, but the other party is discharged from further performance, and is entitled to substantial damages only when there is a material breach.

23 Williston on Contracts § 63.3 (4th ed. 2007) (footnotes omitted).

While a party may bring an action for damages, it still must prove them with sufficient specificity.  If it does not, it is entitled only to nominal damages.  "[W]hile other jurisdictions require proof of actual damages to sustain a breach of contract action, Maryland courts have held that '[i]t is well settled that every injury to the rights of another imports damage, and if no other damage is established, the party injured is at least entitled to a verdict for nominal damages.'" *PFB, LLC v. Trabich*, 304 Fed.Appx. 227, 228 (4th Cir. 2008) (unpublished) (quoting *Cottman v. Maryland, Dep't of Natural Res.*, 51 Md.App. 380, 443 A.2d 638, 640 (1982)).  Thus, even where a party fails to provide evidence sufficient to support a damages claim, "its cause of action for breach of contract cannot fail as a matter of law because [it] is entitled to, at the very least, nominal damages, if the fact-finder determines there was a breach."  *PFB, LLC*, 304 Fed.Appx. at 228 (citing *Planmatics, Inc. v. Showers*, 137 F.Supp.2d 616, 624 (D.Md. 2001)).

For each of the relatively minor breaches of contract established by Plaintiffs here, they will be awarded one dollar in damages.  Plaintiffs would not themselves have been able to sell the eight pizzas for the wedding because of the way the transaction came about.  The charge for the wedding did not

15

separately specify the price of the pizzas and no money changed hands. Similarly, Plaintiffs have not shown that the availability of the *Washingtonian* article on the two websites resulted in any measurable damages.

### 2.   Count Two

Plaintiffs seek declaratory judgments in count two related to the same claims raised in count one. While Plaintiffs were free to seek this form of alternative relief, the court has discretion as to whether it will entertain it. Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, the court must consider three factors in determining whether to grant declaratory relief:

> (1) the complaint must allege an actual controversy between the parties of sufficient immediacy and reality to warrant issuance of a declaratory judgment; (2) the court must possess an independent basis for jurisdiction over the parties; and (3) the court must decide whether to exercise its discretion to determine or dismiss the action.

*Proa v. NRT Mid Atlantic, Inc.*, 477 F.Supp.2d 677, 680 (D.Md. 2007) (internal marks omitted). Given the resolution of the breach of contract claims in count one, the court declines to issue any further declaratory relief.

### 3.   Counts Three, Five, Six, and Seven

The claims against Expressions Catering arise from (1) its advertising the availability of "Ledo Pizza," "Ledo Tiramisu," and "Ledo Lasagna" through its website and menus, and (2) the actual sale of Ledo pizzas on perhaps two or three occasions. Neither Expressions Catering, nor indeed the Marcos brothers, were authorized to sell products under the Ledo name in Calvert County, where Expressions was based at the relevant times.   Once Expressions Catering was established outside of Bowie, it should not have engaged in any advertising suggesting that it was an authorized seller of Ledo products.

### a.   Trademark Infringement

In count three for trademark infringement, Plaintiffs allege that Expressions committed trademark infringement, in violation of 15 U.S.C. § 1114(a), by using the Ledo mark "in connection with the sale, offering for sale or advertising of Expressions Catering['s] business . . . as evidenced by [its] use of 'Ledo Pizza,' 'Ledo Lasagna,' and 'Ledo Tiramisu' in Calvert County, Maryland."   "Such use," according to Plaintiffs, was "without the permission of Ledo Carryouts and constitutes a clear and unequivocal infringement of the Plaintiff[s'] registered trademark."   (Paper 46, Second Amended Complaint, at ¶ 41).

17

To prove trademark infringement, a plaintiff must show (1) that it owns a valid and protectable mark; (2) that the defendant used a re-production, counterfeit, copy, or colorable imitation of that mark in commerce and without plaintiff's consent; and (3) that the defendant's use is likely to cause confusion. *Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC*, 507 F.3d 252, 259 (4th Cir. 2007) (citing 15 U.S.C. § 1114(1)(a)).

Expressions Catering argues that the "first sale exception" applies to its sale of pizzas because only genuine Ledo pizzas were sold in an unaltered state. Under the "first sale" exception, "resale by the first purchaser of the original trademarked item is generally neither trademark infringement nor unfair competition." *Brilliance Audio, Inc. v. Haights Cross Communications, Inc.*, 474 F.3d 365, 369 (6th Cir. 2007) (citing *Prestonettes, Inc. v. Coty*, 264 U.S. 359, 368-69 (1924)). Its rationale for the "first sale" exception is that "'trademark law is designed to prevent sellers from confusing or deceiving consumers about the origin or make of a product, which confusion ordinarily does not exist when a genuine article bearing a true mark is sold.'" *Brilliance Audio, Inc.*, 474 F.3d at 369 (quoting *NEC Elecs. v. CAL Circuit Abco*, 810 F.2d 1506, 1509 (9th Cir. 1987)). The "essence" of the doctrine, therefore, is that

18

"a purchaser who does no more than stock, display, and resell a producer's product under the producer's trademark violates no right conferred upon the producer by the Lanham Act." *Sebastian Intern., Inc. v. Longs Drug Stores Corp.*, 53 F.3d 1073, 1076 (9th Cir. 1995). There can be "no actionable misrepresentation under the statute" where a purchaser simply "resells a trademarked article under the producer's trademark." *Sebastian Intern., Inc.*, 53 F.3d at 1076. This is so because "when a retailer merely resells a genuine, unaltered good under the trademark of the producer, the use of the producer's trademark by the reseller will not deceive or confuse the public as to the nature, qualities, and origin of the good." *Tumblebus, Inc. v. Cranmer*, 399 F.3d 754, 766 (6th Cir. 2005) (citing Restatement (Third) of Unfair Competition § 24 cmt. b).

Here, Defendants argue, Expressions Catering only sold genuine Ledo pizzas, thus its actions do not constitute trademark violations under the "first sale" exception. The focus of their argument, however, is too narrow. Expressions Catering not only actually served pizzas on a handful of occasions, but, more significantly, it advertised that it could supply Ledo products in a manner suggesting that the Marcoses and Ledo Restaurant were behind them and that Expressions Catering was authorized to sell them. This use by Expressions

19

Catering of the Ledo marks was unauthorized.  Expressions made use of the Ledo mark on its website and gave the mistaken impression that it was authorized to provide Ledo products, assuming there was such a thing as "Ledo Lasagna" or "Ledo Tiramisu."[8]

In similar circumstances, courts have recognized that the reseller is not insulated from liability.  "[C]onduct by the reseller other than merely stocking and reselling genuine trademarked products may be sufficient to support a cause of action for infringement." *Sebastian Intern., Inc.*, 53 F.3d at 1076.  A reseller's conduct goes "beyond the mere resale of the trademarked goods" where, for example, it uses the trademark "in a telephone directory advertisement in such a way as to suggest the reseller was one of the producer's franchisees," or "display[s] the producer's trademark in the reseller's booth at a trade show and in a trade journal advertisement, and stamped the reseller's name on the producer's promotional literature and used it to advertise the resale of the producer's products by the reseller." *Id.* (citing *Bandag, Inc. v. Al Bolser's Tire*

---

[8] As discussed above, no pizzas were ever sold under the Ledo mark that were not in fact Ledo pizzas.  The only time "Ledo" lasagna or tiramisu was served was in connection with the Cornerstone event in Bowie and the food was prepared by Jimmy Marcos.

*Stores*, 750 F.2d 903, 911, 916 (Fed. Cir. 1984), and *Stormor, a Div. of Fuqua Indus. v. Johnson*, 587 F.Supp. 275, 279 (W.D.Mich. 1984)).

Here, whether or not the sale of Ledo products was otherwise subject to the first sale exception, the advertising use of the mark clearly was not. On the other hand, the actual sales of Ledo pizzas were not likely to cause confusion, and Plaintiffs have failed to prove this aspect of their claim.

Plaintiffs contend that the first sale exception should not apply to the actual pizza sales because the reheating of the pizzas constituted an alteration. The first sale exception does not apply "'when an alleged infringer sells trademarked goods that are materially different than those sold by the trademark owner,'" *Brilliance Audio, Inc.,* 474 F.3d at 370 (quoting *Davidoff & CIE, S.A. v. PLD Int'l Corp.*, 263 F.3d 1297, 1302 (11th Cir. 2001)) (emphasis removed), because "a material difference in a product is likely to cause consumer confusion and could dilute the value of the trademark," *id*. According to Plaintiffs, it is axiomatic that reheated pizza is vastly inferior to, and thus materially different from, pizza served fresh from the oven. In the context shown by the evidence, though, this difference was not likely to cause confusion. "To be material, a difference must be 'one that consumers consider

21

relevant to a decision about whether to purchase a product,'" but "'[b]ecause a myriad of considerations may influence consumer preferences, the threshold of materiality must be kept low to include even subtle differences between products.'"   *Id*. (quoting *Davidoff*, 263 F.3d at 1302).

The relevant question here is whether the reheating of Ledo pizzas by Expressions Catering was likely to cause confusion as to the quality consumers would expect from pizzas purchased at Plaintiffs' restaurants.  On the two occasions that Ledo pizzas were consumed at Expressions Catering events - the wedding and bar mitzvah - the primary customers were aware that the pizzas were reheated because an oven was rented.  While the guests at the events might not have been aware of the reheating, Plaintiffs have presented no evidence as to how the pizzas were served, nor have they established that the pizzas were even identified as "Ledo" pizzas to anyone other than the purchasing customers.  In short, the court finds, frankly, no likelihood of confusion in the sale of pizzas.  Regardless of issues of reheating and/or labeling as "Ledo" pizza, there is no way guests or attendees at the events would have been misled - or even begin to equate - the pizza served there with pizza that could be purchased on-site at one of Plaintiffs' franchises.

b.  **Unfair Competition**

For the unfair competition claims (false designation of origin) in count five, alleging violation of 15 U.S.C. § 1125, and count seven, alleging common law violation, the analysis is essentially the same.  Pursuant to 15 U.S.C. § 1125(a)(1):

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . . is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . . shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

Plaintiffs' unfair competition claims rest on the notion that because "trademark infringement is a narrower concept [than unfair competition], any finding that it has occurred will, by necessity, support an additional finding that the defendant is also guilty of unfair competition." *Smithkline Beckman Corp. V. Pennex Prods. Co.*, 605 F.Supp. 746, 749 (E.D.Pa. 1985).  The test for claims under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), is whether there is a likelihood of confusion.  *See Scotch Whisky Ass'n v. Majestic Distilling Co.*, 958 F.2d 594,

597 (4th Cir. 1992).   The same test is applied to unfair competition claims brought under the Maryland common law.   *Id*.

As has already been determined, however, the actual sales of Ledo pizzas by Expressions Catering did not create a likelihood of confusion, although its advertising suggesting its authority to provide Ledo products did.

### c.   **Trademark Dilution**

To establish trademark dilution under the Trademark Dilution Revision Act of 2006 ("TDRA"), 15 U.S.C. § 1225, as alleged in count six, a plaintiff must show:

> (1) that the plaintiff owns a famous mark that is distinctive;
>
> (2) that the defendant has commenced using a mark in commerce that allegedly is diluting the famous mark;
>
> (3) that a similarity between the defendant's mark and the famous mark gives rise to an association between the marks; and
>
> (4) that the association is likely to impair the distinctiveness of the famous mark or likely to harm the reputation of the famous mark.

*Louis Vuitton Malletier S.A.*, 507 F.3d at 264-65.

Plaintiffs have presented no evidence of how, if at all, the brief and limited use by Expressions Catering of Ledo pizza,

tiramisu, or lasagna in its sample menus was likely to impair the distinctiveness of the Ledo mark or to harm its reputation.

### d.  Damages/Injunctive Relief

During closing arguments, Plaintiffs' counsel stated that this case was never about damages, but rather about clarifying rights.[9]  In *Xoom, Inc. v. Imageline, Inc.*, 323 F.3d 279, 286 (4th Cir. 2003), abrogated in part on other grounds by *Reed Ellsevier, Inc. v. Muchnick*, 130 S.Ct. 1237 (2010), the Fourth Circuit stated unequivocally that "[t]o recover damages under the Lanham Act, [the claimant] must first establish that there has been a Lanham Act violation, then must prove actual damages and a causal link between those damages and the Lanham Act violation."  Thus, no damages will be awarded for the trademark infringement claims.

Plaintiffs also seek injunctive relief, but that is not necessary.  Such relief is never automatic; rather, it is reserved for those instances where repetition of the offending behavior is likely if not enjoined.  "An injunction is a matter of equitable discretion; it does not follow from success on the merits as a matter of course."  *Winter v. Natural Resources*

---

[9] The pretrial order states that Plaintiffs seek nominal damages and compensatory damages in the amount of $500, plus attorneys' fees.

*Defense Council, Inc.*, 129 S.Ct. 365, 381 (2008). In *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 392-93 (2006), the Supreme Court of the United States rejected the notion that "an injunction automatically follows a determination that a copyright has been infringed," and reaffirmed the traditional showing required to obtain a permanent injunction in any case. To make that showing, a plaintiff must demonstrate: (1) that he has suffered an irreparable injury; (2) that legal remedies, such as monetary damages, are inadequate compensation; (3) that in considering the balance of hardships between the parties an equitable remedy is warranted, and (4) that the public interest would not be disserved. *See eBay, Inc.*, 547 U.S. at 391; *see also Christopher Phelps & Associates, LLC v. Galloway*, 492 F.3d 532, 543 (4th Cir. 2007) (quoting *eBay, Inc.*). Even upon this showing, moreover, the decision as to whether to grant an injunction remains in the "equitable discretion" of the court. *Galloway*, 492 F.3d at 543.

Here, the violations were unintentional and resulted from a series of unfortunate circumstances that could almost be dubbed a comedy of errors. Tommy Marcos responded to a specific request from one customer to provide Ledo pizzas off-site that ultimately led Deborah Hamann to offer Ledo pizza on her menus. Jimmy Marcos helped Expressions Catering get started by

26

preparing "Ledo" lasagna and tiramisu for the Cornerstone event, leading to the inclusion of those items on Expressions' menus. As soon as the Marcos brothers learned of Plaintiffs' displeasure, the practices ceased immediately and all of the principals involved have vowed never to repeat this error. Although the Licensing Agreement will continue in perpetuity, there is no need for an injunction.  The circumstances that led to the violations in this case are unlikely to recur.

### III. Previous Discovery Disputes and Fee Requests

Earlier in this litigation, as part of a discovery dispute, attorneys' fees were sought by Defendants.  The court deferred ruling on the matter pending completion of the proceedings. Both sides have indicated an intent to seek attorneys' fees depending on the ultimate resolution of the merits of the suit. All fee issues will be addressed after any additional motions are briefed.

```
_____/s/_____
DEBORAH K. CHASANOW
United States District Judge
```